CLARK, District Judge.
This case was before this court at a former term on writ of error to the circuit court of the United States for the Western division of the Northern district of Ohio, brought to review a judgment in favor of defendant in error for $12,000. The judgment was reversed, and a new trial ordered. The case was again brought to trial in the court below, and resulted in a judgment in favor of defendant in error, Craig, for $11,000, to review which the present writ of error is prosecuted. In the opinion of the court on the former hearing, the facts were stated by Judge Taft as follows:
“Craig was the conductor or foreman of a night switching crew in the yards of the railway company at Lima, Ohio. He had been in the employ of the company for nearly three years prior to the accident in various capacities, chiefly as brakeman upon a freight train. His service as conductor or foreman of the switching crew in the yards of Lima began on the 16th day of December, 1892, and the accident upon which this action is founded occurred on the 23d of the same month. The switching crew, which consisted of Oraig himself, two switchmen, the engineer and the fireman of the locomotive, had completed their work about 4 o’clock in the morning, had washed themselves, and were waiting until 6 o’clock should arrive, when their duties would end. They received an order to switch two cars, one to one train and one to another, which, coming at this late hour, put them in bad humor. The two cars to be switched were attached to the front end of the engine, and the engine was backed north on the main track in the Lima yard, to what was called the ‘switch,’ into the B track. There was a slight grade from the center of the yard down to the switch. The grade from the switch north on the main track was also downward, though upon this point there was a conflict of evidence. As the train backed down on the main track beyond the switch, Oraig stepped off on the east side of the main track about opposite the switch point, and waited until the train had passed beyond the switch. One of his switchmen turned the switch, and then Craig gave the swift signal to kick the car hard up the B switch. The engineer obeyed the signal, and pushed the cars up the B switch. Oraig stepped in between the first and second cars as they went by him to pull out the coupling pin. He succeeded in doing this, but fell and was run over. His legs were so mangled that both had to be amputated. He was found lying under the firebox of the engine. The contention for the plaintiff in error was that Oraig had caught 'his foot in a frog which was unblocked in violation of the statute of Ohio of March 23, 1888 (85 Ohio Laws, 105), and that this was the cause of the accident. The evidence was very conflicting as to whether the frog was blocked or not. There'was some conflict of evidence also as to the speed of the train at the time when Craig entered between the oars. Oraig himself said that the speed was from three to four or five miles an hour; other witnesses sa'd that the speed was from fcur to five miles an hour. The engineer testified that Craig had given him a swift signal,—that is, a signal for a hard kick,—and that the speed was about ten miles an hour. His fireman, however, thought that it was about five miles an hour. The night was cold and the ground was frozen. The roadbed about the switch was usually moist when not frozen. There was some snow on. the ground. It was quite dark. A rule of the company forbade brakemen and switchmen to enter between cars in motion to uncouple them. This rule was upon the time card furnished by the company to Oraig. It was in evidence that the rule was generally not observed in the Lima yard, and that the violations of the rule were known to the division superintendent and the yard master. The division superintendent admitted upon the stand that the rule was not always observed, but stated that he had cautioned the men against entering between the cars when they were moving too rabidly, and advised them against their taking such risks. It was also in evidence that it was the general custom on *490 railroads to uncouple cars in this way.” 37 U. S. App. 656, 657, 19 C. C. A. 631, and 73 Fed. 642.
The facts disclosed in the record of the case as now brought up are substantially the same, with one important exception now to be stated. On the trial which resulted in the judgment now under review, the circuit court, on objection by plaintiff in error, excluded all evidence showing, or tending to show, that the rule which forbade brakemen and switchmen to go between the cars in motion to uncouple them was habitually disregarded with the knowledge of the division superintendent of the railroad company and the yard master. The rule in question is No. 112, on time card 29, and is as follows:
“112. Every employe is required by these rules and regulations to exercise the utmost caution to avoid injury to himself or to his fellows, especially 'in the switching or other movement of trains; jumping on or off of trains or engines in motion, entering between the cars while in motion to uncouple them, and all similar imprudences are forbidden.”
The circuit judge, in sustaining the objection to evidence of a custom to disregard the rule, gave as a reason for doing so that such evidence did not show that the acts of uncoupling known to defendant’s officers were the same or similar to the manner of uncoupling done by the defendant in error at the time of the accident. The circuit judge said that it would certainly not be sufficient to show that the servants of the company were allowed to uncouple cars at a rate of speed not exceeding one or two miles an hour in daytime with the ground dry and the surroundings favorable. Such facts, it was said, would neither justify the court nor the jury in finding that there was an intention not to require the rule to be observed in the nighttime, when the ground was frozen, covered with snow, and where 'frogs and switches were located, and the danger, in view of these circumstances, much greater. This ruling was made during the examination of defendant in error, Craig, himself, and we may give so much of his examination as related to this point at the time the objection was sustained. It is as follows:
“Q. You may state if Mr. Bell, prior to the time you were injured, was about the yards to your knowledge, at any time while the men were engaged in switching cars and cutting off cars and in coupling cars. A. Well, I don’t know as I ever seen him around there after night, but I saw him there in the daytime. Q. Was he there at any time while the men were so engaged? A. Yes, sir. Q. Did Mr. Bell see the manner in which the cars were cut off and switched? (Objected to as not having anything to do with the ease at this time.) The Court: I will let him answer this question, and see what the next question will be. This particular question is: ‘Did Mr. Bell see the manner in which the ears were cut off and switched?’ I think he may answer that question. Mr. Goekrum: That is, these particular cars? The Court: Yes; if that question refers to Mr. Bell seeing the manner in which cars were cut off at other times, I will sustain the objection. Mr. Cable: Q. Do you know how ears were cut off and switched in the yards of the Lake Erie & Western Bailroad Company at Lima. Ohio, prior to the time you were injured, with reference to the manner in which the work was done,—that is, on December 23, 1892, and prior? (Objected to. Objection sustained, to which ruling the plaintiff then and there excepted.)”
The witness was subsequently asked to state whether there was any difference in the manner in which the cars were cut off and switching done in the nighttime and daytime, and objection to the *491 question was sustained. The witness was then asked if he knew the manner in which the switching was done in the yard in the daytime, to which the witness answered that he did. In regard to what then followed we will allow the record to speak for itself:
“Q. Now state the manner in which the cutting off of cars and switching was done in the yard in the daytime, at and prior to the time you were injured. (Objected to.) The Court: If you will incorporate right in there, and meet the issues fairly and squarely, as to whether or not brakemen and switchmen went in there when the cars were in motion, it will present the matter more directly to the court. I will sustain the objection to this question as it stands. I think you should sustain the objection to this question as to the particular custom. Mr. Cable: I will ask you to state what was the manner in which cars were cut off and switched in the Lima yards of the Lake Erie & Western Railroad Company at and prior to the time you were injured, with reference to brakemen or switchmen going between the cars while they were in motion, to pull the pin, while they were moving at a rate of speed of an ordinary walk, or three or four miles an hour. (Objected to.) Mr. Cable: We offer and expect to prove by the testimony of this witness that the manner of doing switching and cutting off of cars in the Lima yards of the defendant company at and prior to Craig’s injury was by uncoupling the ears in motion, going at a rate of speed of from two to three, four, and five miles per hour, the men going between the cars while so in motion to pull the coupling pin; that the manner of doing the work of switching and cutting or uncoupling cars in the Lima yards of the defendant company at and prior to Craig’s injury was the customary and usual method of doing like work on all the railroads in the United States; that the work of switching and cutting or uncoupling cars in the Lima yards of the defendant company at and prior to the time of Craig’s injury was done in the same manner at night as in the daytime, and in winter as in summer; that the manner of switching and cutting or uncoupling cars in said Lima yards at and prior to the time of Craig’s injury was well known to O. W. Bell, who at the time of said injury to Craig, and for more than one year prior thereto, was the division superintendent of the defendant, having control of the line of railway of the defendant extending from Tipton, Ind., to Sandusky, Ohio, and including said Lima yards, at which latter point said Bell’s office was situated; and that such manner of switching and cutting or uncoupling ears in defendant’s said Lima yards at and prior to Craig’s injury was also well known to John Conners, the night yardmaster of defendant in said yards. (Objection sustained, and plaintiff excepts.)”
Defendant in error further offered to make the same proof by other witnesses examined, but this, too, on objection, was ruled out. It appears from what has been said that the circuit judge entertained the opinion that evidence was not admissible as showing, or tending to show, that the company had habitually disregarded the rule, unless this could be done by proof which established that the rule was not observed under circumstances similar to those existing at the time this particular accident occurred. And this was the basis of the court’s action in excluding the evidence. This is made quite clear in remarks made by the judge, which we have referred to. As we have concluded that one of the objections taken in the assignment of errors requires a reversal of the judgment, we deem it proper to notice the action of the court in excluding the evidence referred to on account of its importance as a question likely to occur on a new trial. We have carefully considered the reasons assigned by the circuit judge for excluding this evidence, and we are unable to concur in his conclusion. We are very clear that the evidence offered was competent, as tending to show an abandonment of the rule which had been promulgated on paper, and that the defendant *492 in error had the right to go to the jury upon the question of the rule having been abrogated. The view of the circuit judge that abrogation of the rule could not be inferred by the jury, unless the evidence tended to show nonobservance of the rule under circumstances similar to those existing at the time of the accident, is not supported by any authority to which we have been referred, and is certainly at variance with sound reason. In the very nature of the case, abrogation of the rule could be established only by evidence of the custom of handling the cars in this particular yard, and at times previous to that of the accident in question. If the proof offered made out a habit of disregarding the rule under circumstances which rendered the danger less than it would be at the particular time and-place in question, this was a consideration which went to the effect of the evidence, and not to its admissibility. It must be observed that the only substantial, permanent difference that could exist in the circumstances would be that between day and night. Otherwise the conditions of the work would be necessarily quite similar. In addition to the darkness of the night, the learned circuit judge attached apparently much importance to the fact that the ground was covered with ice and snow; but the condition of ice and snow would at almost any particular time be the same in daytime as at night. The circuit judge, passing 'on the question, assumed that the rate of speed at the time this particular accident occurred was about five miles an hour, and that the custom which it was proposed to establish of disregarding the rule would show a rate of speed of one or two miles an hour. Upon what authority the circuit judge could make this assumption we are unable to see. The difference in a rate of speed of two miles an hour and one of five miles would be a mere difference in the degree of danger attending the act of uncoupling the cars while in motion. The language of this rule is not doubtful, and requires no interpretation. The rule in terms is equally applicable to the case of uncoupling at a two and five mile rate of speed. And the reason for the rule was to prevent a well-known danger attending an act of this kind while the cars are moving at any rate of speed. The view that the servant may violate the rule, and cast the consequences upon the master, because the danger, although always present, varies with the rate of speed, is clearly unsound. To so hold would be not to enforce, but to nullify, the rule. Furthermore, such a ruling remits the case, in respect of both law and fact, to the question of negligence generally, just as if there were no such rule. So the rule promulgated! by its terms makes no distinction between night and day as to the manner of handling the cars. The witness Craig stated’ that he was aware of the manner in which the cars were handled in daytime as well as at night. If the company in daytime allowed its rule to be disregarded, and the danger incurred of coupling and uncoupling while the cars were in motion, and permitted this to be done habitually, it was such evidence as tended to establish an abandonment of the rule, and should have been admitted, and the question of its effect submitted to the jury. The difference in the condition between day and night might have influenced the jury to find as a fact that a *493 custom, if it existed, to disregard the rule in the day work, did not extend to the night work; although experience might teach the jury that a habit of disregarding wise discipline is not apt to stop at any well-marked limit, the danger differing in degree merely. In ruling out this evidence we think the court was in error. Railroad Co. v. Nickels, 4 U. S. App. 382, 1 C. C. A. 630, and 50 Fed. 722, was a case much like this in all substantial respects as to the time and manner of the accident, as well as the character of the evidence submitted, as tending to show that the rule relied on in that- case was not really in force. The court said:
“To hold that this defendant company could make this rule on paper, call it to plaintiff’s attention, and give him written notice that he must obey it and be bound by it on one day, and know and acquiesce without complaint or objection in the complete disregard of it by the plaintiff and all its other employés associated with him on every day he was in its service, and then escape liability to him for an injury caused by its own breach of duty towards the plaintiff because he disregarded this rule, would be neither good morals nor good law. Actions are often more effective than words, and it will not do to say that neither the plaintiff nor the jury was authorized to believe, from the long-continued acquiescence of the defendant in the disregard of this rule, that it had been abandoned, and it was not in force. The evidence of such abandonment was competent and ample, and the ruling and charge of the court below on this subject were right. Barry v. Railroad Co., 98 Mo. 62, 11 S. W. 308; Smith v. Railroad Co., 18 Fed. 304; Schaub v. Railroad Co., 106 Mo. 74, 16 S. W. 924.”
In the view thus expressed we concur. To the same effect, see, also, Coppins v. Railroad Co., 122 N. Y. 557, 25 N. E. 915; White v. Railwav Co., 72 Miss. 13, 16 South. 248; Eastman v. Railway Co., 101 Mich. 597, 60 N. W. 309; Railroad v. Reagan, 96 Tenn. 128, 33 S. W. 1050. The testimony thus excluded had been admitted, and was in the record which came to this court on the former writ of error, and upon that record Judge Taft, speaking for the court, observed:
“It is also urged in support of the charge below that there was no evidence to sustain the contention that the plaintiff’s going in between the cars was negligence. There was a rule of the company which forbade it. It was in evidence that this rule had been more or less disregarded, and that the division superintendent was aware of it. He himself stated that he had warned the switchman against taking the risk of going in between the ears when they were’ moving too rapidly. If this was all the evidence, the court might have held that the rule had been abrogated, though ordinarily, when the rule Is formally adopted, its abandonment by matter in pais is a question for the jury.”
The trial judge instructed the jury in regard to rule 112 as follows:
“Now, a good deal has been said about the rules of the company. The defendant has pleaded here that according to rule 112 the plaintiff was not allowed to pass in between moving cars, to uncouple them. Testimony has been offered here by the defendant tending to show that the plaintiff had a copy of these rules, and 'his receipt was produced, wherein he pledged himself to study them and be governed by them. I say to you, as I said to you in passing upon the evidence during the trial of the case, that under the facts in this case it is not vital for you to determine whether or not he knew of rule 112 and violated it or not; because the law interposes and says that the employé of a railroad company is bound to do his work in the least perilous manner possible, consistent with his own safety and the best interests of the company. Now, if the plaintiff did attempt to go in there to do this uncoupling, when the cars were moving at a' rapid and dangerous rate of speed, I say to you that he took the risk, and is guilty of contributory negligence under the law, regardless of the rules of the company. If he did not contribute to and was not the *494 cause of the,injury, the simple violation of this rule, which did not involve negligence, would not relieve the company from responsibility. He might violate the rule itself, strictly construed, and not be negligent; that is, the rule providing that no one should pass in between cars while in motion. He might violate that rule by stepping in between ears when going at the rate of two miles an hour, under such circumstances that it would be a violation of the rule and yet not be negligence.”
To this portion of the charge the defendant at the time duly excepted, and now assigns error. The court then refused defendant’s request to charge as follows:
“I also request the court to charge the jury that if Craig violated the rules, and their observance would have prevented the injury, or if he had observed the rules the injury would not have occurred, then he is not entitled to recover.”
The plaintiff in error had introduced evidence to show that at the time the defendant in error accepted employment he, in proper form, acknowledged receipt of time card and rules No. 29, and agreed to carefully study and abide by these rules and to fully conform to their requirements. It was also proved by the division superintendent, Bell, that this same time card with the rules was in effect at the time of Craig’s injury. All evidence tending to show that this rule was not really in force having been excluded, we are left no choice but to treat the case as disclosed by. the present record. Practically, then, the undisputed evidence shows that the rule referred to was in due force, and that Craig was at the time under specific contract obligation to conform to the requirements of the rule. If the evidence be regarded as only tending to establish these facts, the question raised by the assignment of error on this portion of the court’s instructions would be the same; for whether the evidence be treated as undisputed, or' only as tending to establish the existence of the rule in full force at the time, the plaintiff in error was entitled to have the case go to the jury under proper instructions as to the effect of the rule in case the jury should find in accordance with the contention of the plaintiff in error in regard to the rule. Whether or not the defendant’s request, in the form in which it is made, is a strictly accurate statement of the law applicable to the violation of a rule of the company by a servant, and whether, therefore, considered apart from the charge of the court upon the same point, it would support an assignment of error on the court’s refusal to give this instruction, we need not, for the purpose of this case, stop to inquire. It will not admit of question that the refusal of the court to charge as requested, together with the affirmative instruction given upon this point, rendered the rule completely nugatory, and eliminated it from the case, so far as any practical effect might be concerned. Whatever may have been the opinion of the court, it can hardly be doubted that the jury were left to understand that the rule, if really in full force, had practically no effect on the case, and that the case was to be determined by the general law applicable. On examination of the paragraph, it will be noted that the jury was instructed that it was not vital whether the servant knew of and violated the rule; that the law interposed, and that if the servant did not contribute to and was not the cause of the in *495 jury a violation of the rule which, did not involve negligence would not relieve the company from responsibility; that he might violate the rule strictly construed, and not be negligent; and that stepping between the cars when going at the rate of two miles an hour would not be negligence. It may be well, in considering the separate parts of the entire paragraph, to refer to certain rules, now well settled and no longer the subject of question. It is, for example, recognized that a duty rests upon a railroad company, in the operation of a complex and dangerous business, to make rules and regulations for the government of its servants and employés. Railroad Co. v. Camp, 31 U. S. App. 213, 13 C. C. A. 233, and 65 Fed. 952; Railway Co. v. Dye, 16 C. C. A. 604, 70 Fed. 24; Wood, Mast. & Serv. § 403; 3 Wood, Ry. Law, § 382; Reagan v. Railway Co., 93 Mo. 348, 6 S. W. 371.
And, a company being under a duty to make reasonable rules, it needs hardly to be said that there no longer exists any question of its right and power to do so; and that a servant accepting employment with knowledge of such rules, and esnecially when his attention is directed thereto, is under obligation to fully conform to such rules when and so long as they are really maintained in force, and that a servant or employé failing or refusing to observe such rules takes upon himself the risk of the consequences of such disobedience, and is, as matter of law, guilty of negligence which defeats his right to hold the master liable for an injury of which such negligence is the proximate cause. Russell v. Railroad Co., 47 Fed. 204; Brooks v. Railroad Co., 47 Fed. 687; Railroad Co. v. Reesman, 19 U. S. App. 596, 9 C. C. A. 20, and 60 Fed. 370; Railway Co. v. Dye, 16 C. C. A. 604, 70 Fed. 24; Railroad Co. v. Finley, 25 U. S. App. 16, 12 C. C. A. 595, and 63 Fed. 228; Gleason v. Railway Co., 19 C. C. A. 636, 73 Fed. 647, and 43 U. S. App. 101; Railway Co. v. Wilson, 88 Tenn. 316, 12 S. W. 720; Railroad v. Reagan, 96 Tenn. 128, 33 S. W. 1050.
If negligence of the servant in violating a reasonable rule is either the sole proximate cause of an injury, or if without being the sole proximate cause the servant’s negligence concur with that of the master in producing the injury, the master is exonerated from liability, and the servant is without remedy. Railway Co. v. Hoedling’s Adm’r, 10 U. S. App. 422, 3 C. C. A. 429, and 53 Fed. 61; Railroad Co. v. Howe, 6 U. S. App. 172, 3 C. C. A. 121, and 52 Fed. 362.
The doctrine that the master operating a complicated and dangerous business may and must make reasonable rules for the guidance and safety of the employés, that the employé must yield obedience, and tabes upon himself the consequences of disobedience, is a doctrine that is eminently wise, and founded upon the highest considerations of justice and humanity. The master’s right to protect himself from heavy pecuniary liability in the operation of a large business is most important. His duty, by suitable regulations, such as are suggested by experience, to protect as far as may be the servant from risk of injury to himself as well as injury from a fellow servant, for which the master is not pecuniarily liable, and for which there is practically no remedy, is a duty justly imposed by law. And the still higher considerations of the preservation of human life, and the *496 prevention of serious physical maiming and disability with the attendant suffering and the impairment of usefulness, furnish the fullest support and sanction to the doctrine. And the law knows no such incongruity as holding the master to the duty of making, with the right of making, without at the same time requiring from the servant full conformity to the regulations. Notwithstanding that these views are now no longer open to question, the circuit judge, in the paragraph referred to, instructed the jury in effect that the contract conferred no right and imposed no obligation beyond or different from the law applicable to the case in the absence of any contract. It was declared not important whether the servant knew rule 112 and violated it. In the third sentence it is fully implie'd that the servant might violate the rule without such violation involving negligence. The' jury was further told that the rule might be violated, and the servant not be negligent, provided he stepped in between the cars when moving at a rate of two miles an hour. The instruction was erroneous in each one of these particulars. To say that it was not vital whether the servant knew of and violated the rule was contrary to the well-settled law as declared in the cases referred to. The rule in its terms forbids the servant to go between the cars for the purpose of uncoupling them when moving at any rate of speed, and the statement, as well as the implication, that the servant might violate the rule without being negligent, provided the rate of speed was not rapid, was clearly to abrogate the rule, and substitute the judgment of the servant therefor, as was said by the supreme court of Iowa in Deeds v. Railroad Co., 74 Iowa, 154, 37 N. W. 124. We have said that apparently the instructions of the learned judge proceeded upon the theory that the contract, if in force, did not make the case different from what it would be if treated as controlled by the law in the absence of any contract. If such was the view entertained, there was error in this. In the ordinary case of this character, the questions of negligence and contributory negligence, as known to the common law, are questions of fact for the jury. In such a case, whether the servant’s mode of performing his duties is negligent, as well as whether such negligence is the proximate cause of the injury, are both questions of fact to be submitted to the jury under all the circumstances of the particular case; whereas, in a case like this, with a rule in force, the violation of the rule by the servant is as matter of law negligence, as has often been declared, and the only question left open and to be submitted to the jury, as one of fact, is whether or not such negligence was the proximate cause of the injury, or concurred with the negligence of the master in producing the injury. Applying this general rule to the case in hand, the evidence that rule 112 was in force is undisputed, as this record comes to us, and the jury should have been instructed that its violation by the defendant in error was, as matter of law, negligence, and that if such negligence was the sole proximate cause of the injury, or concurred with that of the master as the proximate cause of the injury, the plaintiff in error was without remedy. What was said in the former opinion of this court in this case will be applicable and fully sufficient for any question that may arise on *497 another trial in regard to the proximate cause of the injury, and we refer to that case without repeating what is there said.
In regard to the other errors assigned, we do not think that they are well taken, or that they require any discussion. For the errors indicated the judgment is reversed, and the case remanded, with a direction to set aside the verdict and order a new trial.