## CANADIAN PAC. RY. CO. v. ELLIOTT.

(Circuit Court of Appeals, Second Circuit. April 11, 1905.)

### No. 165.

1. MASTER AND SERVANT—RAILROADS—INJURIES TO SERVANT—RULES—FAILURE TO OBSERVE—ASSUMED RISK.

Where a car repairer failed to observe a reasonable rule requiring a blue flag by day and a blue light by night to be displayed at one or both ends of a car, indicating that workmen were under or about it, and providing that, when thus protected, the car shall not be coupled to or moved, etc., and such failure resulted in his death by another car being pushed against the car on which he was working, he assumed the risk.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 562, 773.

Assumption of risks incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

2. SAME—CUSTOMARY VIOLATION—EVIDENCE.

Where a car repairer was killed while working about a car which he had failed to protect with a signal, as required by rule providing that a signal should be displayed on one or both ends of a car to indicate that "workmen are under or about it," evidence of a witness that, in case of work being done "under a car," it would be flagged, but that, if the workmen were simply going to step behind the car for "a half a minute or so," they would not flag it, he having been employed prior to the adoption of such rule, and having worked under a rule only requiring cars to be protected in case of necessity for car repairers to work "under the car," was inadmissible to show a customary violation of the later rule.

3. SAME.

In an action for death of a car repairer while working about the same without having protected it, as required by rule, evidence *held* insufficient to establish that the rule had become functus officio by frequent violation.

In Error to the Circuit Court of the United States for the District of Vermont.

For opinion below, see 129 Fed. 163.

This cause comes here upon writ of error to review a judgment of the Circuit Court, District of Vermont, entered upon the verdict of a jury in favor of defendant in error, who was plaintiff below. The action was brought to recover for the death of a car repairer in the service of the defendant company, who was run over and killed by a car which he was inspecting at Richford Station, Vt.

F. E. Alfred and W. B. C. Stickney, for plaintiff in error.

W. L. Burnop, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. Besides the main line, there are at Richford several sidings, numbered, respectively, 1, 2, etc. A few minutes prior to the accident a through freight train from Montreal had pulled into the yard. It was necessary to cut some cars out of it. Two cars, which had been in the middle of the freight train, were first sent down siding No. 1 in charge of one Sears as rear brakeman. After they were brought to a standstill, he returned to the train, and five cars located just in front of the caboose were cut out and kicked back on the same siding. Sears rode those also, and they came with great force against the other two cars, driving them back a considerable distance. Deceased and a car inspector, Green, had been examining a freight train which had drawn into the yard on the next siding, No. 2. They had finished that job, and were on their way back to the station to await the next job, when they drew near to the rear of the two cars on siding No. 1. Elliott (the deceased) suggested that they should test the "knuckle"—a part of the coupling—of the rear car. Both of the men thereupon stepped in behind the car, where they would be hidden from the view of any one "riding down" any cars moving towards them on siding No. 1. The testing of the knuckle is an operation very quickly performed, but before they had finished it the five cars struck the two, and, as the latter moved backward under the impact, deceased was knocked down, run over, and killed.

The court left several questions to the jury: First, to determine whether the five cars were properly and prudently controlled in being sent down on the two; second, if they were not so controlled, was that because Sears was not a prudent, proper, efficient, and competent brakeman, such as a prudent man would put in that place? He charged them that the defendant would be liable only if he were short of the proper competency and efficiency as a brakeman; that, if he was a good brakeman, but was at the moment not paying attention, not doing his duty, that would be his fault, and not the fault of the company. The court also left it to the jury to determine whether the deceased was guilty of contributory negligence; to determine what a prudent man would do in view of the whole situation—the rules as they were understood in the yard, the situation of the switch engine and cars up above the highway crossing, the chance deceased had to look and see if the car was coming, and what he had a right to expect as to how much time would be consumed, assuming that the cars would be run down in the usual way. They were to take him as he stood there, knowing the switching crew was where it was, knowing how long it would take to test the knuckle, knowing that his superior was with him, knowing the rule as it was understood in the yard, and to say whether, taking everything into account, he was lacking in prudence in stepping in behind the car to test the knuckle.

These instructions assumed that the testimony would justify the jury in finding that deceased might disregard the rule referred to, speculating on his chances of escaping injury as a consequence of such disregard. The record does not warrant such a finding. For a considerable time prior to August 10, 1901, the company's book of rules and regulations for the guidance of its employés contained the following:

"Rule 14. When necessary for car inspectors to work under a car, they must protect themselves by attaching to the car a red flag by day or a red light by night. The car thus protected must not be coupled to or moved, until the red signal is removed by the car inspector. When a car standing on a siding is protected by a red signal, other cars must not be placed in front of it, so that the red signal will be obscured, without first notifying the car inspector, so that he may protect himself."

This rule was in force down to the time of the adoption of rule 26, on August 10, 1901, when rule 26 became a substitute for and superseded rule 14. Rule 26 is as follows:

"Rule 26. A blue flag by day and a blue light by night, displayed at one or both ends of a car, engine, or train, indicate that workmen are under or about it. When thus protected it must not be coupled to or moved. Workmen will display the blue signals, and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track, so as to intercept the view of the blue signals, without first notifying the workmen."

It is manifest, upon a comparison of the two rules, that the changes introduced by the new are all in the direction of more carefully safeguarding the employés. Engines and trains, as well as cars, may be put under the danger signal. The old rule protected only car inspectors. The new rule covers all workmen, whether their work be inspection or repair. The old rule protected those covered by it only when at work "under a car." The new one protects them when "under or about" a car. Of a rule which required section foremen to carefully flag their truck and hand cars, the Circuit Court of Appeals in the Eighth Circuit, per Caldwell, Circuit Judge, said:

"These rules are reasonable. They are founded on the experience and observation of those who have had the management and operation of railroads from their creation down to the present time. They are essentially for the protection and safety, not only of the property of the company, but of passengers and of the employés of the company, more especially of section foremen and their men. * * * These rules are not incapable of observance; and obedience to them imposes no unnecessary hardship or burden on section foremen or their men, while it protects them from injury. The time of the men required to comply with these rules is the company's. No loss of wages ensues, no matter how much time is taken up in the observance of the rules. It is no loss or hardship to the men, therefore, to require them to obey rules made in great measure for their own protection. * * * Their nonobservance contributed to, if it did not occasion, the accident. The section foreman was clearly guilty of contributory negligence, which precludes a recovery in this case." Kansas & A. V. R. Co. v. Dye, 70 Fed. 24, 16 C. C. A. 604.

"A company being under a duty to make reasonable rules, it needs hardly be said that there no longer exists any question of its right and power to do so; and that a servant, accepting employment with knowledge of such rules, and especially when his attention is

directed thereto, is under obligation to fully conform to such rules when and so long as they are really maintained in force, and that a servant or employé failing or refusing to observe such rules takes upon himself the risk of the consequences of such disobedience, and is, as matter of law, guilty of negligence, which defeats his right to hold the master liable for an injury of which such negligence is the proximate cause." C. C. A., Sixth Circuit, Lake Erie & W. R. R. v. Craig, 80 Fed. 488, 25 C. C. A. 585.

See, also, C. C. A., Fourth Circuit, Richmond & D. R. Co. v. Finley, 63 Fed. 228, 12 C. C. A. 595; C. C. A., Eighth Circuit, per Brewer, Circuit Justice, Atchison, T. & S. F. R. v. Reesman, 60 Fed. 370, 9 C. C. A. 20, 23 L. R. A. 768.

In the case at bar the failure to display the blue flag at the end of the car nearest to the shunting train must be held to have contributed to the accident. No one can say that, with that danger signal in view, either the conductor who cut them out or Sears, the trainman who rode them down, would nevertheless have brought them into violent contact with the cars thus protected. That deceased knew of the rule is indisputable. He had been working as car inspector for several years, and is chargeable with knowledge of the rules contained in the book furnished to him for his guidance. One of plaintiff's witnesses, Green, the car inspector who, in conjunction with deceased, had just finished the inspection of the train on siding No. 2, testified that Elliott had knowledge of the rules because he had heard him talk about them; that he and Elliott knew of the change of rule, because they had blue signals, instead of red; that he had heard Darrow, foreman of the yard, give Elliott instructions in reference to following rule 26, telling him that, "if we went to do anything about a car, to be sure and protect ourselves; if we did anything about a car without protecting ourselves we did it at our risk"; that he had heard Elliott himself give these same instructions to other workmen. Darrow, the foreman, also called for the plaintiff, testified that he had given Elliott those instructions upon an occasion when he had omitted to do something. That the rule was wholly disregarded on the occasion in question is conceded. No blue flag was displayed. Green testified that they both stepped in behind the car upon Elliott's suggestion that they test the knuckle, and that no flag was put upon the car, because the test would be but 10 or 15 seconds' work, and he did not bother with it.

Although an employer may prescribe a printed rule for his workmen to follow, he may nevertheless abrogate or waive it, otherwise than in print. He may knowingly tolerate such a widespread and continuous disobedience to its terms as to make it a dead letter. "To hold that defendant company could make this rule on paper, call it to plaintiff's attention, and give him written notice that he must obey it and be bound by it on one day, and know and acquiesce without complaint or objection in the complete disregard of it by the plaintiff and all its other employés associated with him on every day he was in its service, and then escape liability to him for an injury caused by its own breach of duty towards the plaintiff

because he disregarded this rule, would be neither good morals nor good law." Northern Pac. R. Co. v. Nickels (C. C. A., Eighth Circuit) 50 Fed. 718, 1 C. C. A. 625. See, also, Lake Erie & W. R. v. Craig (C. C. A., Sixth Circuit) 80 Fed. 488, 25 C. C. A. 585; Whittaker v. D. & H. Co., 126 N. Y. 544, 27 N. E. 1042. In one of these cases it appeared that none of the employés, so far as the knowledge of the witnesses (who were all brakemen and affected by the rule) went, ever obeyed the rule; that at the place where the accident happened they constantly violated it; and that the division superintendent, whose office was located there, had frequently seen them violate it and made no complaint or objection. In another, the rule was not generally observed in the yard where the accident happened, and these violations of the rule were known to the division superintendent and the yardmaster; the former admitting upon the stand that the rule was not always observed. In another case the engineer and others, for a period of at least one year, had been in the habit of disobeying a rule which forbade their placing their engines on the main track and leaving them there while awaiting orders. Where, however, it was testified that it was customary for switchmen to violate a rule, but there was no evidence to show that the custom was known to the officers of the company, a different conclusion was reached. Gleason v. Detroit, G. H. & M. Ry. (C. C. A., Sixth Circuit) 73 Fed. 647, 19 C. C. A. 636. See, also, Atchison, T. & S. F. R. v. Reesman, supra. That the evidence in the case at bar falls far short of what has been held sufficient, in such reported cases as we are referred to or have been able to find, to warrant a finding that an express rule of the company has been abrogated or has become a dead letter, will be evident from the following analysis of the testimony:

On this branch of the case, the first witness called by the plaintiff was Whitman, who had been employed as a car repairer in the Richford yard in the winter of 1888–89, many years before the adoption of rule 26. He testified that, "in case we were going to do any work under a car, we would flag it; but, if we were going to step behind a car for half a minute or so, we wouldn't." This testimony was duly objected to and exception was reserved. It was error to admit it, because it was in no way competent to show practical construction or disobedience of a rule which provided for signaling the doing of work "about a car" by proof of what was done under a rule which was applicable only when the person doing the work was "under the car." And we are not satisfied that the error was harmless. Much more of the same sort of evidence was admitted, but the jury did not have their attention called to the difference between the two rules, nor to the necessity of confining their attention to what was done under the later one. It is a reasonable inference that they understood that the entire body of evidence as to putting danger signals on cars was to be considered by them in determining whether rule 26 had been so uniformly and continuously disregarded in the Richford yard as to warrant a conclusion that the officers of the road acquiesced in its violation.

Plaintiff's next witness was Green, deceased's fellow car inspector,

above referred to.  He testified that if they went to do anything about a car, except walking along beside a train that had come in, looking things over, it was the practice and custom to place a flag on the car, even if the job were only to test a knuckle, ten or fifteen seconds' work.  "It was our custom," he said, "to put a flag up for five seconds' work."  Asked why it was not done this time, he said: "I couldn't tell you why we didn't do it; but we didn't do it." Asked if he ever did it, he said: "Sure we did; sure, yes, sir." Later on, when pressed by counsel, he admitted that two or three times before he might have stepped in to test a knuckle without using the flag, "calculating to protect himself."

Plaintiff's next witness was Braman, who had worked in the yard as a car repairer.  He testified that they never used the flags if they were inspecting a car, or simply looking over a car; only used them when working under a car.  But the witness stated that his employment of six years or so was somewhere along in 1890, and that he worked only under the old rule 14, and did not have the new rule 26 in his time.

Plaintiff's next witness was Currier, a laboring man, not at the time of the trial employed by the company.  He had worked for them as a car repairer.  His testimony is very unsatisfactory.  On the direct he testified that he had tested himself, and seen many knuckles tested, and never put up a flag, nor knew of one being put up, for knuckle testing; that he never saw a book of rules; he could not read or write.  On cross-examination he admitted that from the instructions he received he would feel obliged to use a flag if he was required to go behind a car when a shunting engine was at work.  His last service with the company was a year and a half before the trial.  This would bring it no further back than August 23, 1902, subsequent to the accident.  His other term of service with the company was six years before the trial, which would be in 1898, a considerable time before the rule was changed.  There is nothing to show that his narrative deals with operations conducted under rule 26, prior to the accident.

Plaintiff's next witness was Darrow, the yard foreman.  He described the method of inspecting a train which has just hauled in, two inspectors commencing at one end of the train and walking alongside of it, one on each side—the same operation which Green described as looking things over, reporting anything they see wrong to the engineer—and testified that in inspecting a train in that way, it was not customary to put up a flag.  Further on he testified that the instructions were to use the flags on cars "when doing anything about them, inspecting them, or putting bolts into them, or anything about the car that was in the shape of repair.  *  *  * When they are inspecting, they usually have occasions to repair, and it is necessary to have their flags on them while they are under inspection."  He added that he had himself given such instructions to Elliott, and concluded his testimony with the statement that it was the custom and the practice in that yard to put a flag on a car standing alone, when all there was to be done was to test a knuckle. Asked if this was the invariable custom, he said, "I want to make

the exceptions that I caught them once in a while not doing it," on which occasions he reprimanded them and renewed his instruc‑ tions to them.

Plaintiff's last witness was Martin, who had been a brakeman, and had acted as conductor in the yard several times. Apparently he had never been a car repairer nor a car inspector. He testified that he had often seen knuckles tested, and that he did not know of the flag ever being used in simply testing the knuckle of a car; that he had seen knuckles tested without using flags, "I presume hun‑ dreds of times; that is, in my last six or seven years—eight years, something like that." He was in the service of the company 17 or 18 years, and his employment terminated July 4, 1902, not quite a year after the new rule 26 had superseded the old one. Of these "hundreds of times" he makes no discrimination between those which occurred under the old rule and those under the new. His answer would be truthful, although as matter of fact he had not observed more than a half dozen knuckle inspections during his last year of service. His duties did not require him to inspect or repair, or to oversee inspection or repairs. He was a casual ob‑ server only, the dates of whose observations were not so specified in the proof as to make them helpful to a conclusion.

No other witnesses to this branch of the case were called by plaintiff, and nothing on this subject was developed from defend‑ ant's witnesses. In our opinion there was not sufficient testimony to take the case to the jury on any theory that rule 26 had been waived by the company, or had been so frequently disobeyed, with‑ out effort to enforce it, as to have become a dead letter, which the deceased could disregard without assuming the risk resulting from his disobedience of its provisions. The court should have granted defendant's motion to direct a verdict in its favor on the ground that "plaintiff's intestate was acting, at the time of the injury com‑ plained of, in disobedience of the rules and instructions of the de‑ fendant, which disobedience directly contributed to the injury com‑ plained of."

The judgment is reversed, and cause remanded for a new trial.