### McCALMONT et al. v. PENNSYLVANIA R. CO.

(Circuit Court of Appeals, Sixth Circuit. October 4, 1922.)

No. 3603.

1. **Master and servant** ⬅111(1)—**Shifting of defective car at point of repair within permission of Safety Appliance Act.**

Under Safety Appliance Act April 14, 1910, § 4 (Comp. St. § 8621), permitting the hauling of a car found defective in use to the nearest available point for repair, necessary shifting movements in the yards at the repair point are to be considered a part of the unitary movement of the car to the shop or other place of actual repair.

---

**2. Master and servant ⬉129(6)—Defective car must be proximate cause of injury.**

Where an unintended collision causes injury to an employé, a defective coupler is not the proximate cause of the injury unless it was instrumental in bringing about the collision.

**3. Master and servant ⬉129(6)—Defective coupler held not proximate cause of injury.**

A car with a defective coupler, standing with others on a dead track awaiting transfer to the shops for repair, had been attached to the next car by a chain, and plaintiff's intestate, foreman of car inspectors, passing with a helper, went between the cars to shorten the chain, when a collision was caused by the shunting of another car on the track, and he was killed. The rules required all employés, when working about standing cars, to set out a signal flag, but he did not. *Held*, that the proximate cause of the collision and of the injury was the failure to set out the flag, and that the defective coupler was not a cause, but only a condition of the injury, and did not create liability in the company under Safety Appliance Act April 14, 1910, § 4 (Comp. St. § 8621).

**4. Master and servant ⬉111(1½)—Chaining detached standing cars together not a "coupling."**

The chaining together of detached cars which have stood for hours and may stand for hours longer on a side track used only for storage of crippled cars is not a coupling in connection with the movement or hauling of such cars within the meaning of Safety Appliance Act April 14, 1910, § 4 (Comp. St. § 8621).

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Coupling.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action at law by Dolly McCalmont, administratrix, and others, against the Pennsylvania Railroad Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

For opinion below, see 273 Fed. 231.

McCalmont was foreman of car inspectors for the Pennsylvania Railroad at its yard in Conway. These yards were very extensive (counsel say the largest in the United States). One track, known as No. 444, was devoted wholly to use as a dead or storage track for the temporary holding of bad-order cars which must go to the shop for repairs. As cars of that character were found in different parts of the yard, they were switched onto No. 444. Whenever there was a sufficient accumulation—and at least once in 24 hours, and sometimes as often as twice in 24 hours—an engine came in and took the cut of bad-order cars away to the shop, which was at another point in the same yards and about a half a mile distant. It was McCalmont's duty to supervise the cutting out of such cars and their placement on this track and to see they were there put in such condition that they could be coupled together for hauling away. It was the duty of the conductor who might come in after the cars with an engine to get them actually coupled, and thus to make up the train or string of cars for movement.

A car which had just been loaded at Conway for shipment out was found to have at one end a coupler so defective that it would not work without repairs which could only be made at the shop. It was accordingly switched onto track No. 444. It was then attached at this end by a chain to the adjoining car upon this track. After several other cars had accumulated there, McCalmont, in the course of his inspection, observed this chain coupling, considered that it gave too much slack, and he and a helper went between or under the cars in order to readjust it as McCalmont thought it ought to be, so that the car would be ready to move whenever the engine came for it. While he was

thus engaged another car was kicked onto the same track, struck the string of cars there standing, and McCalmont was caught between the two cars where he was and killed.

Rules 26 and 723 of the company were as quoted in the margin.[1] McCalmont was familiar with these rules, but did not display the signal. His helper warned him not to go between the cars because the blue flag was not out, but McCalmont disregarded the warning.

This action was brought in the court below by the administratrix, who sought to recover because of the violation of the Safety Appliance Act, 27 Stat. 531, amended by 36 Stat. 298 (Comp. St. §§ 8605–8623).

The defenses were: First, that the car was not so far in use or being hauled as to make the act applicable; and, second, that the defective coupler was not the proximate cause of the injury. The trial judge thought that each of these defenses was good and directed a verdict for the defendant. The case comes here for a review of this ruling.

D. F. Anderson, of Youngstown, Ohio (Anderson, Lamb & Osborne, of Youngstown, Ohio, on the brief), for plaintiffs in error.

W. C. Boyle, of Cleveland, Ohio (Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] The Safety Appliance Act does not in terms forbid all movements of a defective car. It directs the carrier not to "haul or permit to be hauled or used on its line any car, etc." This forbids hauling "on the line" and using "on the line"; and it might well be thought that the prohibition did not apply at all to merely yard movements (see Louisville & Jeffersonville Bridge Co. v. U. S., 249 U. S. 534, 39 Sup. Ct. 355, 63 L. Ed. 757), and particularly to the movement from one place to another in a yard of bad-order cars which had been set out of use and which movements were incidental to getting them to a shop or repair track. When we observe the language of section 4 of the amendment of 1910 (section 8621), the ambiguity is not removed. The penalty prescribed is for "using, hauling or permitting to be used or hauled on its line any car" etc. The proviso is that, if a car has become defective while being used by such carrier "upon its line," it may be hauled to the nearest available repair point; but this hauling may be done only from the place where the discovery was made. After that haul to the repair point has been completed, the permission of the proviso is exhausted. It is common knowledge that the practical situation requires such a car to be hauled to the yards within which repairs can be made, and then often to wait a considerable time and to be shifted about more or less before work can be done upon it—all as the exigencies of repair

---

[1] "Rule 26. A blue flag by day and a blue light by night placed at one or both ends of an engine, car, or train indicate that workmen are under or about it; when thus protected, it must not be coupled to or moved. Workmen will display the blue signal, and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track so as to intercept the view of the blue signals without first notifying the workmen."

"Rule 723. The car inspector, in the absence of a foreman, will perform the same duties as the foreman in the district assigned to him. When inspecting or repairing cars, he must protect himself by displaying the blue signals as prescribed by rule 26."

work make necessary. After the car has once thus reached the general repair point, it is not easy to say that its subsequent hauling, perhaps from a switch track to the shop or to another switch track, is a hauling "from the place where such equipment was first discovered to be defective." If not, such second hauling would not be within the provisions of the proviso of section 4 of the act of 1910, and a penalty accrues for every such shifting movement in the yard, if such yard hauling is within the primary prohibition. On the contrary, the intent to impose such a penalty under such circumstances seems improbable. We think we must interpret Texas Railway v. Rigsby, 241 U. S. 33, 42, 36 Sup. Ct. 482, 60 L. Ed. 874, as based upon the theory that these intermediate shiftings at the repair point yard are part of the unitary journey of the car from the point of first discovery to the precise point of actual repair on the repair track or in the shop, and are therefore all within the permission of this proviso and all within the declared continuance of civil liability. Reference to the opinion of the Circuit Court of Appeals (222 Fed. 221, 138 C. C. A. 51) in that case shows that there was lack of agreement as to whether the car was actually being hauled or used upon the line within the meaning of the act, and perhaps leads to the inference that its actual presence and current movement upon the main track were, in the mind of the majority, the controlling facts. The opinion of the Supreme Court does not seem to rest upon this particular ground, and, indeed, does not expressly state the conclusion of the court in this respect; but the affirmance of the judgment below necessarily implies that the case disclosed such using and hauling of the car as were forbidden by the act and covered by the proviso.

Though the Rigsby Case is so far controlling, it is in another respect distinguishable. There the car was actually being hauled. In the present case no hauling was in progress or in immediate contemplation. The car was wholly out of present use. The original putting on of the chain and the further adjustment of the chain were in the nature of temporary repairs which would permit the car to be taken to the shop, and, so long as work of this character is not done as a part of the immediate operation of hauling to the shop, it does not seem important whether the expected interval before hauling is a few hours or a much longer time. Fully remembering that the benefits of the act are not confined to those who were actually trying to couple at the moment of the injury, still it does not follow that they extend to one who is merely putting the couplings in condition for a use which, though it may come soon, is distinctly of the future and not of the present.

However, we find the decision of this question unnecessary because of the conclusion which we reach upon the subject of proximate cause. It is quite apparent that the defective coupling was not the direct cause of McCalmont's injury in the same way and to the same degree as in cases where a brakeman is actually trying to make a coupling with a car which is at the moment coming on for that purpose; yet there was a seeming cause and effect relationship from the fact that, except for the defective coupling, McCalmont would have had no occasion to go between the cars at this point and would not have been hurt. We think the properly logical view of such situations, and the authoritative pre-

cedents to be discussed, fairly indicate that such accidents fall into two classes—the one where the impact of the two cars which injures the workman is a part of the movement in which he is purposely participating; the other where this impact is rather a collision which is no part of the plan. In the former class nothing happens which was unintended or which should have been avoided. The presence of the injured person between the cars is the immediate cause of the injury, and that presence was induced by the defective coupling, which is therefore, in law, the proximate cause. In the other class of cases the unintended and unnecessary collision is the immediate cause of the injury, the presence of the injured person at the danger point is an incident or a condition, and we must therefore look to see whether the defective coupler is the cause of the collision. If so, then it is the proximate cause of the injury; otherwise it is a remote cause.

The decisions of the Supreme Court may well be compared, and are fully reconcilable, from this view point. In the Conarty Case, 238 U. S. 243, 35 Sup. Ct. 785, 59 L. Ed. 1290, the defective coupler was the immediate thing which permitted the two colliding cars to come so close together that Conarty was caught between. If the coupler had been in good order, Conarty would not have been hurt. The collision between the defective car and the engine was no part of an intended coupling movement, but was entirely distinct and quite unnecessary. The reasoning of the court is that the injury was caused by the collision, that the collision was not caused by the defective coupling, and hence that the Safety Appliance Act did not create a liability. In the Layton Case, 243 U. S. 617, 37 Sup. Ct. 456, 61 L. Ed. 931, there was a deliberate attempt to make a coupling by impact with a string of five cars standing on the track. Plaintiff was on one of these five cars for the purpose of co-operating in the coupling operation. Owing to the presence of a defective coupler, the attempt to make this coupling failed, and, as the necessary alternative of the failure, the five cars were pushed along the track into collision with others standing there, and this collision was the immediate cause of plaintiff's injury. Therefore in this case there is a direct chain of cause and effect—the intended coupling, the defective drawbar, the resulting unintended collision, and the finally resulting injury. In the Gottschal Case, 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995, the train broke in two, and the imperfect coupler caused the parting, which set the brakes, which caused the unintended stop and shock, which injured plaintiff. In the Lang Case, 255 U. S. 455, 41 Sup. Ct. 381, 65 L. Ed. 729, we have again the case of an unintended collision not caused by a defective coupler. The collision would have occurred just the same if there had been no defective coupler; and thus the case is classified with the Conarty Case. Also, just as in the Conarty Case, the plaintiff would not have been hurt or might not have been hurt except for the defective coupler, but in the Lang Case also the defect was considered a condition, and not a cause of the injury.

[2] The opinion of the majority of the court, read in connection with the minority opinion, makes it clear that, where an unintended collision causes the injury, the defective coupler is not the proximate cause

unless it was instrumental in bringing about the collision. The late Supreme Court cases have recently been carefully considered by the Court of Appeals in the Third Circuit (Philadelphia Co. v. Eisenhart [C. C. A.] 280 Fed. 271), and we read its analysis and conclusion as being in accord with ours. Plaintiff's counsel suggests that the true criterion of liability in these cases is whether the duty in which the injured man was engaged fairly led to his putting his body in the position where the defectiveness of the coupler permitted him to be crushed, or perhaps whether his instant duty was in direct connection with the faulty car; but in the Conarty Case, where liability was denied, Conarty was in the performance of his duty when he put his body where it came between the car sills, and in the Lang Case, where liability was again denied, his duty justified him in putting his foot down where it was crushed by the defective car, while in the Gottschal Case, in which liability was upheld, Gottschal had no duty whatever with special reference to the car whose coupler broke. Hence neither suggested criterion can be sound.

[3] If, however, there were otherwise doubt about the conclusion that the defective coupler was not the proximate cause of McCalmont's death, it would be removed by observing and applying the ruling of the Supreme Court in the Wiles Case, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732. This opinion points out that even in the presence of negligence by defendant which set in motion the train of events and without which the injury would not have happened, yet the plaintiff's own conduct and negligence may be such as to become the intervening and sole proximate cause, leaving the defendant's negligence as a remote cause only. Upon its facts as they are assumed by the Supreme Court, we cannot distinguish that case from this. It is true that the right to recover was not planted upon the Safety Appliance Act, but upon negligence under the Employers' Liability Act, and that any contributory negligence on the plaintiff's part would have diminished the recovery under the Employers' Liability Act (Comp. St. §§ 8657–8665) rather than have been wholly immaterial under the Safety Appliance Act; but the court was not deciding the effect of contributory negligence, but only whether the plaintiff's conduct was contributory negligence or was the sole proximate cause. It could make no difference whether the defendant's negligence in permitting the train to break apart and thus bring Wiles into a place where he was in danger and was killed, was a disputed inference which a jury might draw under the one act, or a presumption of law which must be indulged under the other act. The Supreme Court assumed (240 U. S. 448, 36 Sup. Ct. 408, 60 L. Ed. 732) [2] that there might be negligence, actionable under the Employers' Liability Act, which thus brought Wiles into the position where he was exposed to the danger of an unintended collision, just as the absence of the necessary coupler brought McCalmont into a similar position. Wiles knew, as McCalmont did, that in the regular and ordinary operation of the road such a collision as did take place was liable to occur at

---

[2] "The case at bar is not solved by the doctrine [i. e., by sufficient proof of original negligence]. There is no justification for a comparison of negligence."

any moment. It was Wiles' clear duty, as it was McCalmont's, to take a certain prescribed step which, if taken, would prevent the collision. In each case there was neither negligence in bringing about the collision nor cause for the collision, except the failure of the man hurt to take that step which it was his duty to take to protect himself and others. If Wiles had gone back with his flag, as his duty required, that collision probably might have been avoided. If McCalmont had set out his flag as his duty required, it is even more probable that there would have been no collision. Our affirmance of the judgment below could safely be rested on the Wiles Case alone.

[4] We do not overlook the insistence of counsel that McCalmont was actually engaged in coupling the bad-order car to its neighbor, and that hence all doubt is removed. To say this is to beg the question. To chain together two cars which have stood for hours and may stand for hours more untouched upon a track unused save as a receiving station for the car hospital is of course, in a certain broad sense, to "couple" them; but the word usually describes the operation which accompanies the approach of one car to the other. A crushing impact is the expected incident of the normal coupling, and safeguards are constantly necessary; not so, necessarily, of a "coupling" which calls for no impact.

The judgment is affirmed.