## PASTER v. PENNSYLVANIA R. R.
### No. 343.

Circuit Court of Appeals, Second Circuit.
July 28, 1930.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Morton L. Fearey and C. B. M. O'Kelley, both of New York City, of counsel), for appellant.

Samuel I. Siegel, of New York City (John Winans, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

Paster, the plaintiff, was an assistant yardmaster employed by the defendant in one of its freight yards in Philadelphia. The accident which injured him happened between three and four o'clock in the morning of November 28, 1928, while he was engaged in his work in the yard. He sues under the Federal Employers' Liability Act (45 USCA §§ 51–59). The yard has many tracks leading off a leader, those here important being numbered fifteen, sixteen and seventeen. A freight train was being made up on these, of which the rear end of some seventeen cars stood on track seventeen. On track fifteen stood a string of some seven cars and four on track sixteen. The engine was on the east end of the string on track fifteen facing east, in which direction the train was to move. It went forward off track fifteen and backed west upon track sixteen until it had coupled to the four cars standing there. This made eleven cars in all, which were to be the forward end of the train. While these were so standing, ten loaded coal cars were shunted upon track sixteen from the west by gravity and came in contact with the west end of the eleven cars, their momentum moving the train forward some distance. Between two of the four cars which had originally been upon track sixteen two men were at work, one of whom was the plaintiff; the other was a brakeman called Heney. The plaintiff's foot was run over by the wheel of the west car of those two between which he was at work. He charged that the defendant was negligent in letting the ten loaded cars come down the track with too great momentum, and in sending them down at all after another assistant yardmaster, Sullivan, in charge of the switch tower, had agreed not to do so.

The defendant for a defense alleged that the fault was Paster's because the work on which he was engaged was repair, and because a rule of the defendant required car inspectors, whose work Paster was doing, to set a blue signal at the switch while repairing cars, to lock and clamp it and to require the tower switchman to do the same.

Paster's story was that he had telephoned Sullivan some time before he knew of any trouble in the train, that "we" were going to get the four cars on track sixteen, which ought in any case to have gone upon track fifteen, and that, until advised, he was not to send any cars down that track. Sullivan agreed not to do so. After the engine and its cars had come upon track sixteen, Heney, who had been going over the whole string, told Paster that a leak had developed in the air brake coupling between two cars, and that he wished him, Paster, to repair it. Paster tried to get hold of a car inspector whose duty it was to do such jobs, but could find none, and so undertook it himself. He picked up a lantern and got a wrench from the engine, and went along the track till he came to the defective coupling. This he found it very easy to repair; it only took a few turns of his wrench to do it. Thereupon he told Heney it was all right, and that he should couple up the two air hoses. He then started back walking east towards the engine to return the wrench, leaving Heney to couple. He had got only half a car length, when Heney called him back; he had dropped the rubber gasket which made the joint air tight, and could not find it in the dark. Paster brought back his lantern and leaned between the cars to give Heney light; while in this posture the ten coal cars struck the string and carried him down with the imparted motion.

The rule on which the defendant relies declared that a blue signal displayed at both ends of an engine, car or train, indicated that workmen were under or about it and that it should not then be coupled or moved. When emergency repair work was to be done under or about cars and the signal was not available, the engineman and fireman were to be notified and protection must be given those engaged. In practice it was testified by both sides that the blue light was set at the switch when the car was on a yard track, as here, and the switch was set to close the track and locked in position; also the switch tower was advised, which closed and locked the switch at that place as well. Thus it became important to decide whether this job involved repairs within that rule. The plaintiff said it did not; Strickland, an employee of the defendant, said that it did; Fries, another employee, said that it did not, perhaps a little equivocally. The plaintiff's attorney took the position that while turning the angle cock to close the leak was a repair, the subsequent work of coupling was not, and indeed everybody agreed that coupling as such did not require locking the switches. But the defendant argued that in this case coupling was necessarily a part of the repair, since the hose had to be tested before it could be ascertained whether it had been made tight. The issue really contested and which the judge left to the jury was therefore whether coupling was part of the repair.

■ We do not think that it is permissible to affirm the judgment on the theory that tightening the angle cock, taken alone, was not a repair. In the first place there was a conflict of testimony about it, as we have already shown, and the defendant was entitled to argue that it was, however unlikely its success. Again, we think that the case was tried on that theory with the assent of the plaintiff's own attorney. During his redirect examination of Paster he told the judge that he regarded it as a repair. Nevertheless, as he immediately afterwards called it an "adjustment," it cannot be said that at that point he had committed himself finally. But shortly thereafter he was inquiring whether the practice of setting out the blue signal applied to tightening an angle cock. A colloquy took place at the conclusion of which the judge stated his understanding of the issue, as follows: "You claim there were two operations, one is a repair, and whatever rules and regulations apply to repairs are not in the case because the repair was finished. Then came the coupling, what you do when you couple, what is reasonable when you couple? That is a question for the jury to decide." To which the plaintiff's attorney answered, "I think your honor has very lucidly and completely stated the law applying to this case, and I will desist from further redirect examination on that because I think that fully states the situation there." Considering that this was said while the plaintiff was still on the stand and before the defendant's case began, it seems to us that there was thereafter a mutual assumption that the work done by Paster himself was a repair within the rule, and we must so take it upon this appeal. We do not so hold; the matter is plainly one of railway practice, not merely an interpretation of a document. It is one which we cannot take from the jury, but it was a material issue, as we shall show.

On the other hand, it appears to us that the actual issue litigated, that is, whether the coupling was part of the repair, was not material. Paster by hypothesis should have locked the switch himself, and have told Sullivan at the tower to lock it, before he undertook to turn the angle cock. At least he should have done one; the evidence seems to

indicate that he should have done both. At any rate had he done so, the accident could not have happened, even though the subsequent coupling was not part of the repair as the plaintiff asserts. This is true because he had only got half a car length from the place where he had made the repair before he was called back. He had had no time to unlock the switch, or tell Sullivan to unlock it; had he done his part originally, it would still have been locked, and he could not have been injured. Unless the turning of the angle cock was not a repair within the rule at all, he must abide the consequences of having disobeyed.

█ We should have been disposed to call such inattention contributory negligence which could go only in mitigation of damages, had it not been for those decisions of the Supreme Court to which we shall refer. Every servant is in general subject to a duty to take care for his own safety, and we do not understand that in general it makes a difference that the master may have established an express standard, Canadian Pacific Ry. Co. v. Elliott, 137 F. 904 (C. C. A. 2); Id. (C. C. A.) 161 F. 250. Even after the Federal Employers' Liability Act, when the distinction between contributory negligence and assumption of risk first became important, it was supposed that the violation of a rule, was only contributory negligence. New York, etc., R. Co. v. Niebel, 214 F. 952 (C. C. A. 6). Moreover, such cases as Great Northern Ry. Co. v. Wiles, 240 U. S. 444, 36 S. Ct. 406, 60 L. Ed. 732, and McCalmont v. Pennsylvania R. Co., 283 F. 736 (C. C. A. 6), though often cited as exceptions, do not strictly involve contributory negligence at all, because in those the servant was aware of the earlier fault, and his subsequent disregard of the rule brought the case among those where the last wrongdoer is wholly liable, if he has had opportunity to shape his conduct upon existing facts, however caused.

█ In a series of late cases, however, under the Federal Employers' Liability Act, the Supreme Court has modified this rule, as we understand it (Frese v. C., B. & Q. Ry. Co., 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131; Davis v. Kennedy, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; Unadilla, etc., Ry. Co. v. Caldine, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224); and the lower courts have followed (Southern Ry. Co. v. Hylton, 37 F.(2d) 843 (C. C. A. 6); Unadilla, etc., Ry. v. Dibble, 31 F.(2d) 239 (C. C. A. 2). In these it was held that the disregard by a servant of specific orders or standing rules, promulgated for his own safety, will bar his recovery though the injury was due as well to the fault of other servants. Just how far this may go we do not know; possibly it will be confined to rules which provide for a specific contingency, but apparently it goes at least so far. The decisions concerned engineers, conductors or the like, but if this be material, Paster certainly falls within the class, for he was in charge of the repair. It is not dependent upon the injured person's being in command of those on whose faults he relies to establish liability, Southern Ry. Co. v. Hylton. In spite of the fact, therefore, that we held in Canadian Pacific Railway v. Elliott, that the breach of this very rule was contributory negligence, it seems to us that we are now bound to say that it defeats liability altogether. We must leave it to the Supreme Court to indicate how the doctrine is to be demarked, and whether the breach of any rule is a defense.

█ We cannot see what difference it makes whether the fault relied upon for liability consists in general inattention, or, as here, in the breach of a promise to protect the injured servant. True, it might be argued that such a promise was an excuse for compliance with the rule, but that is clearly untenable. Nobody supposes that two servants can dispense with a valid rule of the master, made exactly for the purpose of avoiding the possibility of lapses in the discharge of their duty. Besides, in the case at bar it was one thing for Sullivan to say that he would send no cars upon track sixteen while the men were working there, and another to ignore a request to lock the switch when repairs were in progress. It is in evidence that the custom was to shunt cars down while coupling was going on, and Sullivan's supposed agreement, which he denied, was therefore in the highest degree improbable anyway. But quite aside from that, the risk involved when repairs were necessary was far greater, and such language as Paster put in his mouth was by no means an equivalent to an agreement to lock the switch.

Therefore without deciding anything else we think, as the record stands, that the judgment was wrong. The case must go back for a retrial in which it must be determined whether the work was in fact a repair. We have spoken of the rule as though it expressly comprised the practice which developed under it, and this we have done deliberately, because, as we have said, both parties have treated it as so enlarged. We have not therefore borne upon the absence of blue lights, since these were not available. The rule pro-

vides for that possibility, and the real question is as to the words, "protection must be given to those engaged in making the repairs." We treat the practice of a double locking of the switch as an interpretation of this language and binding as though expressly incorporated. We cannot suppose that the doctrine upon which we rely distinguishes between the letter and the gloss, provided the gloss be a well established practice.

On the new trial the question of the settlement with Heney may arise. Of course if the plaintiff shows that the defendant paid him money and it appears that it was not in honest settlement of his claim, such evidence is competent and may be important. But if it develops that it was no more than a fair settlement, damage will have been done, since such a concession of liability is almost sure to be taken as an admission of fault. A fair settlement would not tend to show bias of the witness, unless the whole circumstances were tried out, obviously an impossibility. The only way to handle such evidence is to exclude it unless the plaintiff will undertake to prove that the payment was a cover for something more than a settlement. If he fails, no instruction to the jury would cure the damage, and it would seem that the only relief would be a mistrial. We do not say that we should have reversed for this alone, but with this warning it would not be unfair to do so another time. Such questions are especially apt to deflect the minds of a jury from the issues.

Judgment reversed; new trial ordered.