GLEASON v. DETROIT, G. H. & M. RY. CO.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1896.)

No. 355.

CONTRIBUTORY NEGLIGENCE—UNCOUPLING CARS.

Plaintiff was a brakeman on a freight train of the defendant railway company. In order to cut out five cars from the train, and leave them on a siding, such five cars, with the two between them and the engine, were uncoupled from the remainder of the train, drawn forward, and backed down upon the siding. Plaintiff then uncoupled the second car from the first of the five cars which were to be left behind, the coupling on the second car being an automatic one. but attached to the other car by a link and pin; gave the signal to the engineer to go ahead; and rode on the drawbar of the second car to the switch leading to the siding. He there dismounted, closed the switch, gave the signal to the engineer to back down to the remainder of the train, and, as the engine and cars approached the switch, stepped out on the track, and attempted to remove the link and pin from the rear of the second car, while walking in front of the moving train, in order that the automatic coupling might connect with a similar one on the next car. While so walking in front of the moving cars, he tripped on a grade stake between the ties, and was run over and injured. The rules of the company forbade employés to step in front of moving cars. Plaintiff might have removed the link and pin either before the engine and cars began to back, by walking a short distance up the track, or before coupling them to the remainder of the train, by giving the engineer the signal to stop before reaching the standing cars. The track was covered with snow, and, at the point where he stepped upon it, was obstructed by the rails leading into the switch. There was evidence that the rule forbidding employés to step before moving cars was often disregarded, but no evidence that the officers of the company had any notice of such disregard, and it was shown that the course adopted by plaintiff was considered by the employés generally as dangerous. *Held*, that plaintiff was guilty of such contributory negligence as to bar any recovery from the railway company for his injuries, even if the presence of the grade stake constituted negligence.

Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is a writ of error to review a judgment of the circuit court for the Eastern district of Michigan for the defendant in a personal injury suit brought by William J. Gleason against the Detroit, Grand Haven & Milwaukee Railway Company. Gleason was a brakeman in the employ of the defendant railway company. On the 3d day of February, 1894, he was acting as head brakeman upon a freight train running wild; that is, not running upon schedule time. The conductor of the train decided that, in order to reach Pontiac before a regular passenger train was due there, it was necessary to leave five cars of his train upon a switch track at Birmingham, a station upon the road.

Accordingly, all the train but the seven cars next the engine were cut off, and left standing upon the main track, while the engine drew the seven cars forward beyond the switch. When the switch was opened, the engine backed the seven cars upon it, in order to leave the last five cars there. These the plaintiff uncoupled from the two cars attached to the engine. The second car from the engine had what was known as a Gould or Janey coupler, which, when used with another of the same kind, operated automatically, so that the brakeman was not required to step in between the cars to do the coupling. When, however, the Gould coupler was to be coupled to the drawbar coupling in ordinary use, it was necessary to use a link and pin. The connection between the second car from the engine and the next car left upon the side track had been made by a link and pin. The plaintiff, after having cut off the five cars on the switch track, rode upon the drawbar and link of the second car back again to the main track. He jumped off the car as it went by the switch, and turned the switch so that the engine with the two cars attached might back up to the part of the train which had been left upon the main track. As he turned the switch, he perceived that the first car upon the main track with which the coupling was to be made had also a Gould coupler, and that the link upon the second car upon which he had ridden must be removed before the coupling. As he turned the switch, he gave the signal to the engineer to back up. He waited until the car had reached the switch, going at the rate of a fast walk, and stepped in front of it, to remove the pin and link. He had to use both hands to do this. At a point 25 feet from the switch, his foot struck a grade stake, which protruded about 2¼ inches above the ground, in the middle of the main track. He stumbled, and fell forward upon his hands, and attempted to get off the track; but, in doing so, he was run over, about 22 or 23 feet from the point where he stumbled. His right leg was so injured that it had to be twice amputated, and he suffered other injuries. The plaintiff had been in the employ of the defendant company for three or four months, and had been a brakeman for two or three years on other roads. The stake upon which he stumbled was a grade stake, which had been where it was for more than a year. It lay abutting a cross-tie. There was snow upon the ground, and it had drifted up against one side of the stake, so as to partially conceal it. It was cold weather, and the ground was frozen. It was in the afternoon, and in daylight. The passenger train was due at Pontiac at 5:07. The rules of the defendant company required that the freight train should be there 10 minutes before the passenger train. The run from Birmingham to Pontiac was a little over 7 miles, and usually required 35 minutes. It was 15 minutes after 4 when the freight backed off the siding, and was about to start for Pontiac. This left 42 minutes in which to make the run, which usually took 35 minutes. The plaintiff, in his evidence, however, stated that they had but 25 minutes in which to make the run, which usually took 35, and he was therefore in a hurry. On cross-examination, the plaintiff stated: "As soon as I had set the block, I got down, and rode back on the link of the rear car of the two attached to the engine. I sat on the link, and hung on the drawbar. Why I did not pull the pin while sitting on the link was because I could do it more conveniently after backing up, and I could not pull it while sitting on it. I could not pull before starting north with the two cars, because I had to run to catch them. I jumped off when the car passed the switch, so as to turn the switch and lock it. I did not go beyond the switch. I swung them down. It was my duty to do so. I did not ride as far as the cars went. I dropped off, and went over to the switch, so as to turn it, so these two cars could be put on the main track. As I turned the switch, the rear car where the pin was might have been twenty or twenty-five feet north of the switch. Q. Now tell the jury, after you had turned the switch, and while the car was standing still, why didn't you walk up there, and take that link out? A. The car was not standing still after I had the switch turned. Q. You said it didn't back up until you gave the signal? A. Well, I gave him the signal to stop, and, when I threw the switch, he knew enough to back up, and then I had given him the slow signal. Q. Then, before he commenced to back up, you gave him the signal to back up, didn't you? A. Well, about the same time. Q. Now, just once more tell the jury, while that car was standing there, why didn't you step up and take out that pin? A. I didn't have time to walk down and do it. I had 25 minutes ahead

of the mail to make Birmingham. I swung him down, and started him back at the same time. Q. Then the fact is that the engine and the two cars commenced to back up before you attempted to take the link and pin, is that so? A. Started to back up; yes, sir. When they started to back up, I was standing by the switch, waiting for them, until the cars got opposite me. About two or three seconds I waited, until the car was opposite about two or three feet north of the switch, when I stepped in front of it, to take out the link and pin. I had to walk over the ties where the split switch is. There are some six or eight of those ties. I got over the switch ties without any trouble. I went about twenty-five feet up to where this stake was before I met with any obstruction. I was faced kind of sideways like, going right along the track, kind of a fast walk. The train was backing all the while. The pin came out without any trouble. I took some eight or ten steps before I got it out. I took the pin out with one hand, and the link with the other, and let the pin drop back in, and threw the link to one side." Again, the witness said: "When I got off from my seat on the coupling at the point of the switch, the last car had passed over the switch. As I got off, I signaled the engineer to stop. After that I threw the switch for the main track, locked it, and gave the signal to back up. It took me about as long as it took the engineer to stop and back up even with the switch. When I had got the switch locked, the rear car that was backing was about four to eight feet north of the switch. I stood at the point of the switch until the car got right opposite me. Then I went in between the rails, to do what I have described. Q. After you had put these cars into the side track, what order or direction, if any, did the conductor give you? A. The conductor said, after we put in the four cars: 'Get on and set the brake of that head car, Billy, and let them out on the main track, and couple up and get out of here.' Q. Mr. Gleason, when did you first discover that there was a Gould coupling attached to the stationary car? A. Well, I discovered that after getting off the link that was on the two cars, and after giving the engineer the signal to back up, and from my switch I looked down and saw in the stationary car there was a Gould coupler there, and the jaw was open. Q. Where was the rear car attached to the engine with the other Gould coupler then? A. It was backing for the switch towards me. Q. How far from you was the car when you discovered that there was a Gould coupler on the stationary car; that is, how far from you was the rear car that was advancing? A. The rear car was about opposite me from the switch stand, or perhaps a foot or so behind, but I got in opposite the switch just immediately. Q. Now, on the day of the accident, how did you know that the north end of the train that was standing on the main track was a car that had a Gould coupler upon it? A. Because, when I threw that switch at the switch stand, I saw it. I could see from where I stood the Gould coupler on the car on the main track, and knew the one on the north end of the two cars that were attached to the engine was a Gould coupler also. I knew that by the looks of it."

Rule 24 of the company, which the plaintiff had received and read, was as follows: "All persons entering into or remaining in the service of this company are warned that the business is hazardous, and that, in accepting or retaining employment, they must assume the ordinary risk attending it. Each employé is expected and required to look after and be responsible for his own safety, as well as to exercise the utmost caution to avoid injury to his fellows, especially in the switching of cars and in all movements of trains. Stepping on the front of approaching engines and cars, jumping on or off trains or engines at high speed, getting between cars while in motion to uncouple them, coupling by hand when it is practicable to use a stick or pin for guiding the link, and all similar imprudences, are dangerous and in violation of duty, and strictly prohibited. Employés are warned that, if they commit them, it will be at their own peril and risk. Employés of every rank and grade are warned to see for themselves, before using them, that the machinery or tools which they are expected to use are in proper condition, or see that they are so put, before using. All will be held responsible accordingly. The company does not wish nor expect its employés to incur any risk whatsoever from which, by the exercise of their judgment and by personal care, they can protect themselves, but enjoins them to take time in all

cases to do their duty in safety, whether they may be at the time acting under orders of their superiors or otherwise."

The plaintiff sought and was permitted to introduce evidence of the custom among switchmen on defendant's road and other railroads of removing links from the Gould coupler of a car while in motion just before it was to be coupled with another Gould coupling. Accordingly, the plaintiff's counsel put this question to the plaintiff: "Q. And, during the time you were employed by the defendant railway company, state whether or not there was any custom as to the removal of a link from the Gould coupler attached to a car moving backward to be coupled to another car to which a Gould coupler was attached. (Objected to by defendant as incompetent and immaterial. Answer permitted by the court.) A. Yes, sir; the custom was to step in between the rails ahead of this car, take the link in one hand, and pull the pin with the other, also move along with the car." James F. Lynch testified that "the custom is that when they are backing up the engine and cars, and there is a link in the car, we get in and remove the link if they are going slow enough. We remove the link before we make the coupling, if necessary to remove it." On cross-examination the witness testified as follows: "Brakemen take chances in going, while the car is in motion, to remove a link, if it is going too fast. The only excuse for plaintiff going in and walking back in front of the car would be that they were probably in a hurry to get away. He could not have walked on the side and get the link out. The better way would have been for him to have removed the link before giving the signal to start, if he knew the link was to come out, and if he had time. It would have been the safest way for him to take the link out before he signaled the train to back to make the connection. I think it would have been the proper thing for him to take the link before he gave the order to the engineer to back up, provided he knew it was to be taken out. If he rode back on the link, he must have known that it was there. It is always dangerous to go in front of a car when it is being backed up. A man that goes in, in that way, takes his chances. The only excuse there could be for him to go in and walk back in front of the car to take out that link, the engineer being under his control, would be that they were probably in a hurry to get away. It would have been a great deal safer to remove the link while the car was standing. Walking over those switch ties, and also having to step over the rail that extends off from the main track onto the side track, would be a dangerous place. The switch ties are considerably higher than the surface of the ground. There being snow on the ground, and being frozen, it would naturally be slippery. Plaintiff having opportunity to take the link out while the car was standing, it would be negligence for him to go in and walk over the ties and rails. It would depend a good deal on how fast they were going. The faster they were going the greater the danger. It is always dangerous to go in front of a train that is moving. If the cars were 300 feet apart, I don't think it would be necessary to go in between the switch rails where it bears off to go onto the side track." Robert H. Stagg testified that it was the custom to step in between the rails next to the moving car to take the link out, and throw it aside with one hand, and to raise the pin with the other. That this was the custom on the defendant's road. On cross-examination he testified as follows: "Q. Would not the safe way and the proper thing for him to have done have been to have walked along by the side between the side track and the main track until the car that was backing up had arrived nearly to the car that was standing on the main track, and then signal the engineer to stop, and go in and remove the pin? A. I suppose that is according to the rule. Q. That is according to the rules? A. Yes, sir; but it is not customary. Q. But you men do this for your own convenience, to get over the road, as you call it? A. We do it to save time and hold our positions. If we don't, we lose our jobs. Q. Never mind your job. Now, I want to ask you the question, what officer of the company did you ever tell you were habitually doing it? A. I have not told any one of them. Q. And you have no knowledge any officer saw you do it, have you? A. Not that I know of. Q. So that every time you went in there you knew you were violating the rules of the company, didn't you, while the cars were in motion? A. Of course, but— Mr. Hurd: I object to this as incompetent. It is a question of the construction of the rule, and we say the rule

don't apply at all— Court: Mr. Hurd, I will give you an exception." The witness continues: "It would have been the safe thing and the right thing for him to remove the link before he gave the order to back after he turned the switch if he was within 20 or 25 feet of it. It was reckless for him to go in there, and walk over those switch ties, and over that rail that led from the main track onto the side track if he did not know it was necessary to remove the link in order to make the coupling. The safest way would be for the plaintiff to walk back between the main track and the side track, and wait until the car arrived nearly to the one standing on the main track, and then signal the engineer to stop, and then to go in and remove the link. The plaintiff selected the most dangerous place he possibly could for the purpose of removing the link by going in where this split switch passed over the ties and over the rail, where it led from the main line onto the side track." Similar evidence was given by three other brakemen who were called to testify to the custom of going in to remove a link from a coupler while the car was in motion.

At the conclusion of the defendant's evidence, the court directed a verdict, on the ground that the plaintiff, on his own evidence and on all the evidence in the case, was shown unquestionably to have been guilty of contributory negligence causing the accident.

Hurd, Brumback & Thatcher and G. W. Radford, for plaintiff in error.

W. B. Williams, Harrison Geer, and L. C. Stanley, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge (after stating the facts as above). The judgment must be affirmed. We do not see how a verdict for the plaintiff upon this evidence could possibly be allowed by the court, in its judicial discretion, to stand. The plaintiff had the choice of doing the work which it was his duty to do either in a safe or in a very dangerous and reckless way. This is fully established by his own evidence. He chose the reckless and dangerous mode, and he must bear the consequences of his choice. It is urged on his behalf in this court that he was in a hurry; urged thereto by the conductor. The language of the conductor does not indicate that he told him to be in a hurry, but only that he should be prompt. The time which he proposed to save by the course he took, instead of removing the link while the car was at a standstill before the engine backed up, was so slight as not to make any practical difference whatever in the train's reaching its destination at Pontiac. He says that he did not perceive that the stationary car had a Gould coupler until he turned the switch; but he might have seen it, and it was his duty to see to this in order to determine at a time when he could safely remove the link whether it was necessary to do so. He knew that the link was there, because he rode on it, and knew, also, that Gould couplers were common in Michigan, because the statute of that state requires that all cars now made in Michigan should have Gould couplers. It was his duty to anticipate, therefore, the probability that the car to which the coupling was to be made would be a Gould coupler, and that it might be necessary to remove the link. By not removing the link when the car was not in motion, he took his chance of injury from a removal of the link while the car was in motion as it passed the switch. Even then there was no necessity

for his going in front of the car, for he might have waited until the two cars had come near together, and then have stopped the engine by a signal, and have removed the link. He had two courses which were entirely free from danger, and one which, by the evidence of his own witnesses, was very dangerous; and he selected the dangerous one.

Rule 24 strictly prohibited as dangerous, and in violation of duty, stepping on the front of approaching engines and cars, jumping on or off trains or engines at high speed, getting between cars while in motion to uncouple them, coupling by hand when it was practicable to use a stick or pin for guiding the link, and all similar imprudences. It was certainly within the inhibition of this rule for the plaintiff to step in front of a moving car to remove a link, when it was possible and proper for him to remove the link before the car began to move. It was manifestly an imprudence similar to those exactly described in the rule, and plaintiff's own evidence shows that it was so understood by the defendant's employés. It is attempted, however, to justify plaintiff's course by proof that it was customary for switchmen to do what the plaintiff did. The evidence thus introduced did not show that the custom was known to the officers of the company; but it did show that the custom when practiced in a situation like that in which the plaintiff was, even by those who testified to it, was regarded as dangerous and reckless, as contrary to the rules of the company, and as only to be followed at the risk of the employé. The supreme court of Michigan has reached similar conclusions on all the points here considered in a case very like this one in all its facts. Loranger v. Railway Co. (filed Feb. 12, 1895) 62 N. W. 137.

It is contended on behalf of the plaintiff that, even if the course which the plaintiff took was negligence, it was not the proximate cause of the accident, because he did not know of the presence of the grade stake. The obstruction offered by the grade stake was ot different from that which was offered by the cross-ties and the cross-rails. It was exactly of the same character, and it was of the class of dangers which the plaintiff had every reason to anticipate in going in between the rails and in front of the moving car under the circumstances. It seems to us clear, as a matter of law, therefore, that his negligence was the proximate cause of his injury.

The present case is a different case from that considered at the present term in Railway Co. v. Craig, 73 Fed. 642. There the accident happened by reason of an unblocked frog, the presence of which the plaintiff had no reason to suspect. It was held that the question of proximate cause in that case was a question for the jury, because the jury might there reasonably have found that the trap-like character of the unblocked frog was such a new independent and unexpected cause of the accident as to break the chain of legal causation between the plaintiff's negligence in stepping in between the moving cars and the injury which did occur from the unblocked condition of the frog. We reach our conclusion in this case on the assumption that the presence of the stake in the middle of the track for a year tended to show negligence on the part of the company,

causing the accident. The evidence was insufficient in law to sustain a verdict for the plaintiff, and required the court below to direct a verdict for the defendant. Judgment affirmed.