THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY V. ELIZABETH A. RUDOLPH.

No. 15,298. (99 Pac. 224.)

SYLLABUS BY THE COURT.

1. PERSONAL INJURIES—*Injury to Employee—Election of Ways —Contributory Negligence.* Where the employee of a railroad company in the discharge of his duties has two methods by which his work can be accomplished, one safe and the other dangerous, and he voluntarily and of his own choice adopts the dangerous method and is injured while so engaged, no recovery from the railroad company can be had for such injuries.

2. ———— *Recovery for Death by Wrongful Act Barred by Contributory Negligence.* Where a railroad company furnishes its freight-cars with automatic couplers, coupling by impact, with which cars may be coupled and uncoupled with safety and without going between the cars, and a brakeman refuses to use such safety appliance but voluntarily adopts the dangerous method of going between the cars and riding on the brake-beam while making a flying switch, and is fatally injured while so engaged, no recovery can be had against the company, under section 422 of the civil code, by the surviving widow or personal representative of the deceased.

Error from Barber district court; PRESTON B. GIL-LETT, judge. Opinion filed November 7, 1908. Re-versed.

### STATEMENT.

CHARLES T. RUDOLPH was a brakeman and an employee of the Atchison, Topeka & Santa Fe Railway Company. On January 13, 1902, while engaged in the performance of his duties at Sharon, in Harper county, he fell in front of a moving car and was killed. His widow commenced this action in the district court of Barber county to recover damages on account of the death of her husband. She obtained judgment for $4000. The railway company brings the case here for review.

The deceased, while making a flying switch, got upon the brake-beam at the front end of a moving cattle car, holding himself in place by clasping one of the slats across the end of the car. The slat was old, defective, loose at one end, and gave way, causing the deceased to fall in front of the car, where he was run over and killed. It was his duty to couple this car to another, and he was riding on the brake-beam for the purpose of performing such duty. The car was equipped with a coupler which coupled automatically by impact, and which the brakeman could operate without going between the cars when coupling or uncoupling. This coupler was so constructed that he could stand in an iron stirrup on one side of the car, and, while hanging to an iron handhold with the left hand, reach down and with the other hand operate the coupler by a lever. It was more convenient for Rudolph to operate the coupler when standing on the brake-beam than when in the position on the outside of the car made for that purpose, for the reason that he was a fleshy man and it was difficult for him to reach down and around the corner of the car to the lever.

The jury returned special findings of fact, which, so

far as material in the consideration of the questions involved, read:

"(4) Ques. Is it a fact that while making a flying switch the said Charles Rudolph was standing on brake-beam of Atchison, Topeka & Santa Fe car No. 51,340, in train No. 467, of which George T. Knight was conductor, F. W. Merrill, engineer, and H. J. Dice, fireman? Ans. Yes."

"(21) Q. Was or was not said car at the time in question equipped with couplers coupled automatically by impact? A. Yes.

"(22) Q. Was car No. 51,340, at the times in question, provided with stirrup, grab-irons or handholds in the ends and sides thereof for the greater security to the men in coupling and uncoupling cars? A. Stirrup and ladder on side; one grab-iron on sill at end.

"(23) Q. Were said grab-irons securely fastened? A. Yes.

"(24) Q. Had the said Charles Rudolph at any time objected to or protested against assisting in making such flying switches as was made at the time in question in this suit? A. No.

"(25) Q. Did the said Charles Rudolph voluntarily participate and assist in making whatever flying switches had been made with the trains with which he was at work, on and prior to the day in question in this action? A. No."

"(28) Q. Instead of making a drop of the cars by means of the flying switch, could not the crew have more safely accomplished the same purpose by running around the cars and thus dispense with the need of any one riding between the car and the engine, while in motion, to uncouple same? A. Yes.

"(29) Q. Had not conductor Knight, on the day Rudolph was killed, informed Charles Rudolph that it was more dangerous to make a drop of the cars by means of the flying switch than it was to accomplish the same purpose by means of running around the cars in the manner described by the witnesses? A. Yes."

"(40) Q. If you find for the plaintiff, then do you base your verdict on any negligence of the defendant as regards track or switch at or about the place of the accident in question? A. No."

"(44) Q. How near did the lever, on the car in

question, connected with the coupling extend toward the outer edge of the car—that is, how far from the outer edge was the handle of said lever? A. About ten inches."

"(47) Q. Was the lever on the car in question in good working order at the time Rudolph uncoupled said car from the engine? A. Yes."

"(49) Q. Did Rudolph take hold of the handle of the lever and uncouple the car and engine just prior to the injury in question? A. Yes."

"(51) Q. Did Rudolph go between the car and engine to uncouple them because of any existing custom to uncouple cars in that manner? A. Yes.

"(52) Q. Was Rudolph in the habit of going between moving cars to uncouple them prior to the time of the injury in question? A. No.

"(53) Q. Were the acts of said Rudolph in riding between the cars and doing the things you may find he did do safe and prudent acts for him to perform at said time and place? A. Yes.

"(54) Q. Were the acts of said Rudolph in riding between the cars and doing the things you may find he did do unsafe and imprudent acts for said Rudolph to perform at said time and place? A. No."

*(Questions submitted by plaintiff.)*

"(1) Ques. State whether or not there was a custom generally practiced on the lines of the defendant of making flying switches. Ans. Yes.

"(2) Q. If you answer question 1 that there was such custom, state whether or not such custom had been generally followed for several years prior to the fatal injury to Mr. Rudolph. A. Yes.

"(3) Q. If you answer question 1 that there was such custom, state whether or not such custom was known to superior officers of the defendant having control of the operation of trains in territory diverging from Wellington, including the place where Mr. Rudolph was injured. A. Yes.

"(3a) Q. If you answer question 3 'Yes,' or in the affirmative, state whether such custom was acquiesced in by such officers. A. Yes.

"(4) Q. If you answer question 1 that there was such custom, state whether or not conditions frequently existed requiring brakemen in making flying switches

with cars coupled with automatic couplers to be in be-tween the cars on the brake-beams. A. Yes.

"(5)· Q. If you answer question 4 'Yes,' state whether or not it was common practice for brakemen to go in on the brake-beam in making flying switches with cars in defendant's trains equipped with automatic couplers. A. Yes.

".(6) Q. If you answer question 5 'Yes,' state whether or not such practice had existed for years be-fore Mr. Rudolph's injury, with the acquiescence of the defendant. A. Yes.

. "(7) Q. If. you answer question 4 'Yes,' state whether or not one of such conditions was in having the handle of the lever for uncoupling so located that it would be either difficult or impossible for a brake-man to operate the same from the ladder or stirrup on the side of the car. A. Difficult, but not impossible.

· "(8) Q. If you answer question 7 'Yes,' state whether or not the handle of the lever on the car from which Mr. Rudolph fell was so located that a brake-man of his build could not ordinarily operate it suc-cessfully from the ladder and stirrup. A. He could not.

"(9) Q. If you answer question 4 'Yes,' state whether or not one of the conditions requiring brake-men to stand on the brake-beam while making flying switches with cars equipped with automatic couplers is the automatic coupler working hard or binding. A. Was not.

"(9a) Q. Did defendant have in common use cars of other companies with end ladders requiring brake-men to go between the cars to use the same? A. Yes.

"(9b) Q. Does defendant provide part of its open-slatted cattle cars with handholds located at about the point where Rudolph used the slat to hold to? A. Yes.

· "(10) Q. Are cars which do not have open-slatted ends provided with grab-irons located on the closed ends at about the point where Rudolph used the slat, so as to be available for use by brakemen standing on the brake-beam while making flying switches? A. Yes.

"(10a) Q. State whether or not, in a proper con-struction of cars for use as you find it was proper to use them, there should be a handhold provided at about the point where Rudolph used the slat. A. Yes.

"(10b) Q. State whether or not the car in question

had no iron handhold at about the place where Rudolph used the slat. A. No.

"(11) Q. State whether or not the west end of the car from which Mr. Rudolph fell had a regular iron handhold or grab-iron so located as to be sufficient for the purpose of supporting the brakeman while working on the brake-beam while making a flying switch. A. No.

"(12) Q. If you answer question 11 that there was no sufficient iron handhold or grab-iron, state whether or not a brakeman working on the brake-beam at the west end of that car, in making a flying switch, would ordinarily be called upon to support himself by holding onto the slats on the end of the car. A. Yes.

"(13) Q. If your answer to question 12 is 'Yes,' state whether or not the officers of the defendant company having charge of furnishing cars in use for its trains should have known that a brakeman making a flying switch from the brake-beam at the west end of the car from which Mr. Rudolph fell would probably rely upon the slats for support. A. Yes.

"(14) Q. State whether or not the proximate cause of Mr. Rudolph's death was a fall in front of a moving car by reason of the breaking of a slat in the end of the car upon which he was relying for support. A. Yes.

"(15) Q. If you answer question 14 that the proximate cause was the breaking of the slat, state whether or not such slat broke by reason of a defect therein. A. Yes.

"(16) Q. If you answer question 15 that the breaking of the slat was due to a defect therein, state whether or not such defect had existed for at least three months prior to the injury to Mr. Rudolph. A. Yes.

"(17) Q. If you answer question 15 that the breaking of the slat was due to a defect therein, state whether or not such defect could have been discovered by a reasonably careful and prudent inspection of said car. A. Yes.

"(18) Q. If you answer question 14 that the proximate cause was the breaking of the slat, state whether or not the slat which broke was loose and not fastened at one end. A. Was not fastened at one end."

Railway Co. v. Rudolph.

*William R. Smith, O. J. Wood,* and *Alfred A. Scott,* for plaintiff in error.

*Samuel Griffin,* and *Boyle, Guthrie, Howell & Smith,* for defendant in error.

The opinion of the court was delivered by

GRAVES, J.: The railway company contends that, since it has at great expense complied with the act of congress by placing upon its cars couplers which couple automatically by impact, thereby enabling its employees to couple and uncouple cars without encountering the danger of going between them, it should not be held liable for injuries sustained by an employee who voluntarily and unnecessarily goes between the cars to do the coupling instead of using the safe method which has been provided for that purpose, as the deceased did in this case.

The defendant in error contends that, notwithstanding the safe coupling appliances furnished, it is more expeditious and convenient to make a flying switch, such as was being made by the deceased, when a brakeman is on the brake-beam between the cars, as the deceased was located; and for this reason it had long been the custom among the employees of the defendant railway company to make couplings in that manner. It is further contended that this custom was known to, and acquiesced in by, the company, and it encouraged such practice by placing iron handholds on its cars so as to make it more convenient to handle the cars in that manner than by the use of the safer appliance. It is urged that the acquiescence of the defendant in this custom has been such that employees were justified in regarding it as an approved method of doing such work, and the railroad company thereby became bound to keep its cars supplied with appliances suitable for such practice, and a failure to do so was negligence. Upon this theory it is insisted that the failure to have the car in question furnished with a

strong, sound slat, sufficient to sustain the deceased while making the coupling, was negligence.

Other matters are discussed, but the foregoing statement presents the real questions involved in the controversy, and none other need be considered.

The deceased in this case was not directed to couple and uncouple cars by any particular method. The car which he was required to couple, on the occasion when he received the injury of which complaint is made, was furnished with an automatic coupler, as provided by act of congress. It was designed to protect brakemen from the very danger which the deceased encountered and in which he lost his life. He used the brake-beam method, not because it was the only or the best means at hand, nor because directed by his master to do the work in that manner; but he adopted it with full knowledge of the danger involved, because it was more convenient for him than the safe way required by law and provided for by the railway company. It is not claimed that the company or its officers directed or advised its employees to make flying switches in this manner; they did it voluntarily and of their own choice.

We are unable to attach much importance to the alleged knowledge and acquiescence of the company. The most that can be said of it is that some of the company's officers knew that such switches were being made and the practice was not prohibited. It is not claimed that the company directed, advised or in any affirmative manner approved of this method of coupling cars. It was simply known and tolerated. The employees adopted this method of their own choice, when it suited their convenience. In the view we have taken of the facts the case must be decided upon the particular transaction, and the long usage or custom of the employees in making couplings or flying switches at other times and under other circumstances can not be regarded as controlling. The deceased undertook to handle a car which was provided with a coupler by the

use of which he could, with some inconvenience, perform his duty with absolute safety. He declined to use the safe manner, and of his own choice adopted a method which was known by him to be extremely dangerous—a method where under the most favorable conditions the least slip or misstep would almost certainly result in death. This was a clear violation of duty and prudence. The presence of the automatic coupler on that car was equivalent to a direction from the company to use it. These safety appliances are provided with the expectation that they will be used. The humane and beneficent considerations which prompted the enactment of this law can not be realized unless its provisions are observed and complied with by both employer and employee. The duty to provide these appliances, and the duty to use them when provided, are reciprocal, and a failure to perform this duty by either party is negligence. It has been held that when a railroad company in compliance with the safety appliance act furnishes its employees with the required appliance it becomes their duty to use it, and a failure to do so will bar a recovery for injuries which would have been avoided by such use. (*Gilbert v. Burlington, C. R. & N. Ry. Co.,* 128 Fed. 529, 63 C. C. A. 27.) In the case cited it was said:

"It is so dangerous for the employees of railroad companies to go between the ends of cars to couple or to uncouple them that congress passed an act on March 2, 1893, which made it the duty of common carriers to equip all their cars engaged in moving interstate traffic with couplers which can be uncoupled 'without the necessity of men going between the ends of the cars' (27 Stat. 531, c. 196, 3 U. S. Comp. St. p. 3174), and the legislatures of many of the states have enacted laws of a similar nature to regulate carriers within their respective borders. In this way the duty was imposed upon common carriers by the law to so equip their cars that they could be uncoupled without requiring their servants to go between the ends of the cars. The devolution of this duty upon the carriers necessarily imposed upon their servants the correlative

duty of using the equipment thus furnished to them, and of refraining from going between the ends of the cars to couple or uncouple them unless compelled to do so by necessity. Under this legislation the breach of either of these duties became a failure to exercise ordinary care, and constituted actionable negligence. The two cars which the plaintiff sought to uncouple were supplied with mechanical devices for separating them without requiring the employees of the railroad company to go between the ends of the cars. These devices were not defective in construction or repair. There were two of them, either one of which could ordinarily enable the servant to uncouple the two cars. One of them had its lever on the east side of the train, where the plaintiff was at work, and could be operated from that station. The other had its lever upon the west side of the train, and could be utilized only from that side. The plaintiff first endeavored to uncouple the cars by the use of the device on the east side of the train, while the string of cars was stationary. When the train was drawn tight, so that there was no slack between the cars, or, as the witnesses expressed it, 'when the slack was tight,' the cars could not be uncoupled, either with or without the use of the levers. When the plaintiff first attempted to separate the cars the slack was tight, and consequently he could not pull the pin by the use of the lever. The engine then pushed the cars to the south, and as they moved along the plaintiff attempted several times to pull the pin by means of the lever upon which he still kept his hand, and failed. He then stepped in between the ends of the cars while they were moving at the rate of between two and three miles an hour, and tried to uncouple them by seizing the chain above the pin with his hands and raising them. The act of placing himself between the ends of the cars to uncouple them without first endeavoring to do so by the use of the lever on the opposite side was an act of negligence, because the use of that lever was a less dangerous method of separating the cars. Where there is a comparatively safe and a more dangerous way known to a servant by means of which he may discharge his duty, it is a want of ordinary care for him to select and use the more dangerous method. *Morris v. Duluth S. S. & A. Ry. Co.*, 108 Fed. 747, 749, 47 C. C. A. 661, 664; *Gowen v. Harley*, 56 Fed. 973, 983, 6 C. C. A. 190, 200; *Coal Co. v. Reid*, 85

Fed. 914, 29 C. C. A. 475; *McCain v. Railroad Co.*, 76 Fed. 125, 126, 22 C. C. A. 99, 101; *Russell v. Tillotson*, 140 Mass. 201, 4 N. E. 231; *Gleason v. Railway Co.*, 73 Fed. 647, 19 C. C. A. 636; *Cunningham v. Railway Co.* (C. C.), 17 Fed. 882; *English v. Railway Co.* (C. C.), 24 Fed. 906. Not only this, but if the plaintiff had adopted the less dangerous method, if he had proceeded to the other side of the train and had uncoupled the cars by the use of the west lever, he would not have walked in the space between the rails where his foot was caught, and he would not have been injured. Even if he had first vainly tried to operate that lever, he would not have walked over the space where he was hurt, and he would have escaped injury. So that there seems to be no escape for a reasonable man, who considers impartially these facts, from the conclusion that the plaintiff was guilty of negligence in refusing to use the lever on the west side of the train and in entering and walking between the moving cars for the purpose of uncoupling them, nor from the conclusion that this negligence directly contributed to his injury.

"Counsel for the plaintiff, however, ably and persuasively urge several reasons why, in their opinion, the negligence of the plaintiff was not fatal to his recovery here. They call attention to the testimony of several witnesses to the effect that it was the custom or habit of the servants of the company to ignore the lever on the opposite side of the train, and to step in between the cars when they were moving, and uncouple them with their hands, when the lever on their side of the train would not produce this effect, and they insist that it was not negligence for the plaintiff to follow the ordinary course pursued by his associate operators in cases of this character. But 'if a man exposes himself to a risk unnecessarily he is guilty of negligence, although it be shown that other persons have done the same thing and escaped unhurt. The inherent quality of an act is not changed, whether done by one or many.' *Dawson v. Chicago, R. I. & P. R. Co.*, 114 Fed. 870, 882, 52 C. C. A. 286, 288. The danger of entering and walking between the moving cars was so imminent and obvious that no custom to do so unnecessarily could deprive the act of its inherently negligent character." (Page 533.)

It is a well-established rule of law that where two

methods of procedure are open to an employee, one safe and the other dangerous, he must take the safe way, even though inconvenient, or he will be barred from a recovery. (*Quirouet v. Ala. Great So. R. Co.*, 111 Ga. 315, 36 S. E. 599.)   In that case the court said:

"When an employee has his choice of two ways in which to perform a duty, the one safe, though inconvenient, and the other dangerous, he is bound to select the safe method, and if, instead of so doing, he elects to pursue the dangerous way, and is in consequence injured, he is guilty of such negligence as will bar an action for damages against the master.   The principle here announced is recognized law in the state of Alabama." (Syllabus.)

In the case of *Carrier v. Railway Co.*, 61 Kan. 447, 59 Pac. 1075, the syllabus reads:

"If the plaintiff voluntarily and knowingly adopted an unsafe, instead of a safe, way of doing the work mentioned, and thereby received injuries, he can not recover therefor."

The conduct of the deceased as shown in this case was grossly negligent.   He might have done this work safely.   He chose to adopt a recklessly dangerous method of performance.   The railway company was in no way responsible for the fatal consequences, and should not be held liable therefor.   The mere fact that some of its officers knew that at other times and under other circumstances its employees had used the same method, and such method had neither been approved nor prohibited by the company, does not affect its liability.

The judgment of the district court is reversed, with direction to enter judgment for the defendant.